GEORGE JOSEPH HAGUE AND GAIL ROSE HAGUE, PLAINTIFFS-APPELLANTS, v. WILLIAM E. WILLIAMS, DEFENDANT-RESPONDENT.

Argued March 5, 1962—Decided May 21, 1962.

Mr. *Paul Bartel* argued the cause for plaintiffs-appellants (*Messrs. Bartel & Sartoga,* attorneys).

Mr. *Kevin M. O'Halloran* argued the cause for defendant-respondent (*Messrs. Morrison, Lloyd & Griggs,* attorneys).

The opinion of the court was delivered by

HANEMAN, J.  Plaintiffs filed a complaint consisting of seven counts. In the first five counts they sought damages based upon the alleged intentional or negligent acts of defendant physician (1) in failing to tell them the truth regarding the health of their child, Linda, (2) in mis-

representing to them her condition of health, (3) in failing
to discover her physical impairments. In the sixth and
seventh counts they sought damages arising from an un-
authorized disclosure by defendant to the insurer of the
life of plaintiffs' daughter concerning the child's physical
condition at the time application for the policy had been
made. After answer filed, defendant moved to dismiss the
seven counts on the ground that they did not state a claim
upon which relief could be granted. The trial court denied
defendant's motion insofar as the first five counts were
concerned but granted the motion addressed to the sixth
and seventh counts. The order entered pursuant to that
conclusion determined, *inter alia,* that "there is no just
reason for delay of the entry of a final Judgment of Dis-
missal on the sixth and seventh Counts of the Complaint;
and * * * a final judgment be and is hereby entered in
favor of defendant and against the plaintiffs on the sixth
and seventh Counts * * *." Plaintiffs appealed to the
Appellate Division. Before argument there this court
certified the appeal on its own motion. (*R. R.* 1:10–1(a).)

The complaint alleges the following facts insofar as the
sixth and seventh counts are concerned:

Defendant is a duly licensed physician of New Jersey,
specializing in the field of pediatrics. Prior to the birth
of their daughter Linda on May 27, 1959, plaintiffs had
engaged defendant to "examine [her], when born, and
report any physical or emotional abnormalities, recommend
any treatments or procedures deemed necessary or desirable
and to do all other things which a pediatrician has a duty
to do * * *." During the four months following Linda's
birth defendant examined her approximately eleven times
and on at least three of these occasions the plaintiffs or
one of them informed defendant that "the baby seemed to
breathe with some difficulty and that it cried considerably."
Defendant replied that "there was nothing to be concerned
about and that such symptoms are frequently found in
very young babies." Defendant never indicated "the exist-

ence or possibility of existence of heart trouble of any kind." On January 23, 1960, the baby became seriously ill and at 2:15 A. M. the following morning was rushed to the hospital. The baby died that day and an autopsy disclosed that the child had a congenital heart defect.

In the sixth count plaintiffs allege specifically that George Hague, the father, entered into a life insurance contract with the Lincoln National Life Insurance Company under which he insured the life of the baby in the amount of $1,500, he being the owner and beneficiary of the policy. At the time the above application was made plaintiff represented that the baby was in good health to the best of his knowledge and belief. After the baby died and plaintiff had filed a claim for the life insurance policy proceeds, the insurance company, during its investigation, sought information from defendant, who thereupon advised the insurer that the baby had had heart trouble since birth, a statement which he had never made to either of the plaintiffs, and which they allege defendant was not privileged to make to anyone else without express permission had in advance. Plaintiffs asserted upon the argument of the motions that they were humiliated as a result of defendant's conduct in that the insurance company rejected their claim with the intimation that they had attempted to defraud it.

In the seventh count plaintiffs repeat the allegations of the sixth count and assert that "as a result of defendant's failure to inform plaintiffs of the baby's physical condition, plaintiff George Hague was unable to collect the proceeds of said life insurance policy and finally collected a net amount (after legal fees) of only $600.00 after filing suit. Wherefor, plaintiffs on this count, demand judgment in the amount of $900.00."

Plaintiffs base their right to recovery for damages under the sixth and seventh counts upon an alleged breach by the defendant of a duty not to divulge confidential information. They argue that defendant was under a duty not

to reply to the inquiry of the insurer as to the state of health of the child, without their express authorization.

The essential question on appeal, then, is whether there exists a duty which defendant allegedly breached, *i. e.,* whether the knowledge of the child-patient's pathological condition obtained by defendant physician in the course of consultation or treatment is of such a confidential nature that the physician is barred from an extrajudicial disclosure thereof, absent plaintiffs' consent.

Plaintiffs argue that the medical profession is bound by self-imposed ethical principles not to disclose information received from patients. As authority, they cite:

"Whatever, in connection with my professional practice, or not in connection with it, I see or hear, in the life of men, which ought not to be spoken of abroad, I will not divulge, as reckoning that all such should be kept secret." (*Oath of Hippocrates,* 400 B. C.).

"Section 9. A physician may not reveal the Confidences entrusted to him in the course of medical attendance, or the deficiencies he may observe in the character of patients, unless he is required to do so by law or unless it becomes necessary in order to protect the welfare of the individual or of the community." (*Principles of Medical Ethics,* 1957, published by American Medical Association.)

The issue of liability of a physician for disclosure of information received from or about a patient arises most often in actions for defamation. See Annot., 73 *A. L. R.* 2d 325 (1960). Research has disclosed no New Jersey cases involving an action such as here brought and there is a paucity of reported opinions in other jurisdictions as well. See 43 *Minn. L. Rev.* 943 (1958–59).

Plaintiff has cited only four cases in support of his contention that a patient has an absolute privilege against any unauthorized extrajudicial disclosure of information obtained from or about him by his physician, *i. e., Simonsen v. Swenson,* 104 *Neb.* 224, 177 *N. W.* 831, 9 *A. L. R.* 1250 (*Sup. Ct.* 1920); *Smith v. Driscoll,* 94 *Wash.* 441, 162 *P.* 572, *L. R. A.* 1917C, 1128 (*Sup. Ct.* 1917); *Clark v. Geraci,* 208 *N. Y. S.* 2d 564 (*Sup. Ct.* 1960); *Berry*

*v. Moench,* 8 *Utah 2d* 191, 331 *P. 2d* 814, 73 *A. L. R. 2d*
315 (*Sup. Ct.* 1958). The first three enumerated opinions
generally recognize a right of action similar to that here
brought. However, in each of the States in which said
actions were brought there were statutes preventing a
doctor from testifying in court as to communications re-
ceived from a patient. Hence there existed an established
public policy recognizing a confidential relationship. In
none of the cases was recovery of alleged damages had.

In *Simonsen,* the physician treated plaintiff, a hotel
resident, and diagnosed his affliction as contagious syphilis
whereupon he urged plaintiff to leave the hotel. When
returning to the hotel the following day defendant learned
that the plaintiff had not departed and he then informed
the proprietress that he thought plaintiff had a "contagious
disease" and to be careful in changing his linens. Plaintiff
was then forced to leave the hotel. The court held defend-
ant violated no duty because he had "made no further
disclosure than was reasonably necessary under the circum-
stances; and that he acted in good faith and without
malice."

In *Smith,* the allegation was that the physician-defendant
had divulged professional secrets in his testimony in court.
The complaint was held deficient for not containing allega-
tions that such testimony was neither relevant nor pertinent
to the case and, although the court assumed for argument
that an action existed for similar revelations when made
extrajudicially, that language must be regarded as *dictum.*
It might be noted, parenthetically, that while a statute
protecting physician-patient communications existed at the
time of that decision, no mention of it was made in the
opinion.

The plaintiff in *Clark,* a civilian employee of the Air
Force, based his action on the fact that the defendant
doctor had sent, on request, a letter to the Air Force
revealing therein that plaintiff's work absences were due
to alcoholism. Plaintiff had, on previous occasions, requested

certificates from defendant as to the reasons for his absences and defendant gave them but omitted to include therein the cause of the disabling symptoms. The court held that in requesting the certificates as bases to excuse his absences plaintiff waived his right to protest against defendant's disclosure, upon request, of the underlying cause of the absences.

These cases, therefore, are not authority for the proposition for which they are cited. They do, however, extend some judicial recognition to a limited extra-statutory physician-patient privilege.

The fourth case cited, *Berry v. Moench, supra,* was an action for defamation. Again, Utah by statute created the physician-patient testimonial privilege. Defendant doctor had sent a letter to a confrere informing him that plaintiff had suffered from a severe mental illness. The letter was in response to the request of the other physician who wished to relay information of the character of plaintiff to the parents of a girl whom plaintiff was courting. The court was of the opinion that the happiness and well-being of the young lady were interests sufficient to warrant such a disclosure, and that the physician-patient relationship gave rise only to a limited privilege in disclosures made outside of judicial proceedings. Thus, even though a physician was precluded by statute from testifying in court to information acquired during treatment, this strong public policy was not regarded by the Utah court as grounds for extending an absolute privilege to extrajudicial disclosures where other interests involved might outweigh those of the patient.

Although we are not here concerned with the physician-patient privilege as it deals with testimony in a judicial proceeding, by analogy the history and thinking behind this phase of the privilege bear a direct relationship to the present problem. The common law did not recognize a physician-patient privilege and, although approximately two-thirds of the States have adopted the privilege by statute,

New Jersey is not among this number. 8 *Wigmore, Evidence,* § 2380 (*McNaughton rev.* 1961). See, *e. g., Bober v. Independent Plating Corp.,* 28 *N. J.* 160 (1958); *Gilligan v. International Paper Co.,* 24 *N. J.* 230 (1957); *State v. Gruich,* 96 *N. J. L.* 202 (*E. & A.* 1921); see also *N. J. S.* 2A:84A–17 to 32.

■ We have, then, no expressed public policy pointing to a general prohibition against testimonial revelation of information acquired during the physician-patient relationship, but, on the contrary, our policy is to expose such information to view when it is relevant to the resolution of litigation. See *Report of the Committee on the Revision of the Law of Evidence to the Supreme Court of New Jersey* (1955). This approach is in accord with the general theory that society has a right to testimony and that all privileges of exemption from this duty are exceptional. See 8 *Wigmore, supra,* § 2192.

It is for this reason that creation of such a privilege has been stated to be justified only upon satisfaction of four fundamental conditions, the last of which being:

"(4) the *injury* that would inure to the relation [physician-patient] by the disclosure of the communications must be *greater than the benefit* thereby gained for the correct disposal of the litigation." 8 *Wigmore, supra,* § 2285, *p.* 527.

From what has already been said, it is obvious that the policy of this State regards that condition as being unfulfilled. See also *id.* § 2380(a).

However, the same philosophy does not apply with equal rigor to non-testimonial disclosure. The above ethical concepts, although propounded by the medical profession under its own code, are as well expressive of the inherent legal obligation which a physician owes to his patient. The benefits which inure to the relationship of physician-patient from the denial to a physician of any right to promiscuously disclose such information are self-evident. On the other hand, it is impossible to conceive of any countervailing

benefits which would arise by according a physician the right to gossip about a patient's health.

■ A patient should be entitled to freely disclose his symptoms and condition to his doctor in order to receive proper treatment without fear that those facts may become public property. Only thus can the purpose of the·relationship be fulfilled. So here, when the plaintiffs contracted with defendant for services to be performed for their infant child, he was under a general duty not to disclose frivolously the information received from them, or from an examination of the patient.

■ This is not to say that the patient enjoys an absolute right, but rather that he possesses a limited right against such disclosure, subject to exceptions prompted by the supervening interest of society. We conclude, therefore, that ordinarily a physician receives information relating to a patient's health in a confidential capacity and should not disclose such information without the patient's consent, except where the public interest or the private interest of the patient so demands. Without delineating the precise outer contours of the exceptions, it may generally be said that disclosure may, under such compelling circumstances, be made to a person with a legitimate interest in the patient's health. See 43 *Minn. L. Rev., supra,* 960; 8 *Wigmore, supra,* 856. One of these exceptions arises where, as here, the physical condition of the patient is made an element of a claim. While that claim had not yet been pressed to litigation, the same policy which during litigation permits, even demands, disclosure of information acquired during the course of the physician-patient relationship allows the disclosure thereof to the person against whom the claim is made, when recovery is sought prior to or without suit. At this point the public interest in an honest and just result assumes dominance over the individual's right of nondisclosure.

■ When plaintiffs made a claim involving the health of the patient, they lost any right to nondisclosure they

may have had and defendant was justified in conveying the relevant information to the insurer upon its request.

Affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.